UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| CHRISTI JULES | * | CIVIL ACTION NO. 12-2521 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Christi Jules, born May 7, 1976, filed applications for a period of disability, disability insurance benefits,[1] and supplemental security income ("SSI") on December 8, 2008, alleging disability as of May 13, 2009, due to opioid dependence, borderline personality disorder, affective disorder and right knee problems.[2]

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the

---

[1] Claimant remains insured through June 30, 2012. Thus, she must establish disability on or before that date to be entitled to a period of disability and disability insurance coverage.

[2] Claimant amended her onset date from October 8, 2008 to May 13, 2009. (Tr. 16, 40).

Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Crowley Mental Health Center dated August 26, 2008 to July 6, 2010**.  On August 26, 2008, claimant was referred by jail personnel after she was arrested for probation violation.  (Tr. 197).  She presented with unstable mood and depression, anxiety, suicidal ideations, irritability, and problems controlling her anger.  She reported past auditory hallucinations and psychiatric treatment since childhood.  (Tr. 194).  She had previously been treated at Crowley Mental Health Center in 2002 and diagnosed with major depression and anxiety disorder.

The impression was bipolar disorder, most recent episode depressed, severe with psychotic features, post-traumatic stress disorder, opioid dependence, and borderline personality disorder.  Her Global Assessment of Functioning ("GAF") score was 40-50 for visits in 2008 and 2009.  (Tr. 193).  She was prescribed Seroquel and Vistaril.  (Tr. 197).  In March 2010, her GAF score was assessed at 50.  (Tr. 278).

**(2) Records from American Legion Hospital dated September 14, 2008**.

Claimant was admitted with suicidal ideations.  (Tr. 204).  On examination, she

was uncooperative, and her affect was labile.  (Tr. 205).  Dr. Charles Bramlet's

diagnostic impression was bipolar disorder, mixed, with suicidal ideations and

dramatic cluster personality, probably histrionic.  Her GAF score was 30.  She was

admitted for treatment.

On discharge, claimant's diagnosis was polysubstance abuse, dependency,

opioids, personality disorder, not otherwise specified, probably borderline

personality disorder.  (Tr. 203).  Dr. Bramlet noted that claimant understood what

she was doing and how it affected other people.  She was prescribed Celexa.

**(3) Records from LSU University Medical Center ("UMC") dated**

**September 26, 2008 to March 5, 2009**.  On October 1, 2008, claimant was seen

for newly diagnosed HIV.  (Tr. 233).  She complained of night sweats.  (Tr. 234).

Her CD4 count was 500 with a reference range of 228-2290.  (Tr. 229).

On December 1, 2008, claimant was referred for detox and HIV.  (Tr. 228).

She complained of right leg pain after a fall.

On January 27, 2009, claimant complained of right knee pain for four

months.  (Tr. 220).  X-rays showed a comminuted nondisplaced fracture of lateral

femoral condyle.  (Tr. 216).  She was prescribed Voltaren, Darvocet, and a hinge

3

knee brace.  (Tr. 221).

A CT scan of the right knee dated February 17, 2009, showed nondisplaced comminuted fracture of the lateral tibial plateau.  (Tr. 214).  Right knee series dated March 5, 2009, showed nondisplaced un-united fracture of the lateral femoral condyle with increasing sclerosis.  (Tr. 212).

**(4) Physical Residual Functional Capacity ("RFC") Assessment dated April 8, 2009**.  Dr. Joseph Michalik found that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk about six hours in an eight-hour workday, and had unlimited push/pull ability.  (Tr. 254).  He determined that she could occasionally climb, kneel, crouch, and crawl, and frequently balance and stoop.  (Tr. 255).  Dr. Michalik assessed claimant with a light RFC.  (Tr. 251-52).

**(5) Psychiatric Review Technique ("PRT") dated August 12, 2009**.

Claimant was scheduled for a Psychiatric Review but she did not appear or reschedule.  (Tr. 261).

**(6) Records from UMC dated April 5, 2009 to August 16, 2010**.

Claimant was admitted to the detox unit at University Medical Center on May 4, 2009 for opioid dependence and was discharged against medical advice on May 12, 2009.  (Tr. 308).  The physician's notes indicate her prognosis was excellent. (Tr. 312).  In the progress notes on May 4, 2009 the doctor indicated

indicate that she was oriented, alert, and cooperative.  Her mood was somewhat depressed and irritable, but her affect was appropriate and she reported no suicidal ideations.  (Tr. 318). The doctor's impression was Opiate Dependency, Ecstacy Abuse, and Bipolar Disorder. (Tr. 318).

There are multiple records from UMC regarding claimant's right knee, which she injured in October of 2008.  (Tr. 339).   Radiology reports from December 2009 and June 2010 conclude that claimant has an healed lateral femoral condyle with mild osteoarthritis.  (Tr. 337 and 331).  Visits to UMC in June and August of 2010 reflect that claimant was still reporting pain and difficulty with the knee.  (Tr. 326-27).

**(7) Claimant's Administrative Hearing Testimony**.  At the hearing on October 4, 2010, claimant was 34 years old.  (Tr. 36).  She had completed the eighth grade and was in special education classes.  (Tr. 37).  She testified that she was 5 feet 4 inches tall and weighed 143 pounds.

Claimant testified that she had been underweight two years prior because she was taking inappropriate medications.  She stated that she was addicted to Lortab at one time, which took away her appetite.  (Tr. 37-38).  She reported that she was still using Lortab, but only as prescribed.

5

Regarding employment, claimant testified that she had last worked before she went to jail in April 2008.  She was incarcerated on a probation violation at that time.  Her original charge was for writing bad checks.  (Tr. 39).

Claimant's original onset date was October 8, 2008, the date of her HIV diagnosis.  (Tr. 40).  However, the date was amended to May 13, 2009, which was the day after she left the UMC detox center.

Claimant testified that she had worked at Wal-Mart as a cashier until she went to jail.  (Tr. 41).  She had also worked at a hospital laundry for a couple of years.  (Tr. 41-42).  She had also worked as a cashier at a gas station and a dietary worker at a nursing home.  (Tr. 43, 62).  She said that she had been fired from all of her jobs because she could not get along with people or follow directions.  (Tr. 53, 63).

Regarding complaints, claimant testified that her main problems were mental, but she also had issues with her leg.  (Tr. 43-44).  She stated that she was scheduled for knee surgery that month.  (Tr. 44-45).  She said that she had walked with a brace since January, 2009.  (Tr. 45).

Claimant reported that she had been sober for over a year.  (Tr. 44).  She said that was still taking Lortab and Ultram for her right knee, but did not take Lortab every day.  (Tr. 44, 59).  She said that she also had symptoms from HIV.

6

(Tr. 44).

Claimant testified that she had been diagnosed with HIV two years prior. (Tr. 46).  She stated that she had had lab work done a few times, most recently two months ago.  She said that her symptoms includes nausea, vomiting, diarrhea, lack of appetite, sweating and fatigue.  (Tr. 47-48).

Claimant reported that she slept between five and six hours per night.  (Tr. 48).  She said that she was going to start retroviral treatment every six months. (Tr. 57).

As to her mental condition, claimant testified that she was in therapy for depression and bipolar disorder.  She stated that she spent time by herself because she did not really get along with people, including her family.  (Tr. 49, 52).  She said that she had gotten in fights with co-workers and supervisors.  (Tr. 50).

Claimant said that her three children lived with their fathers because the fathers thought she was unfit.  (Tr. 51).  She reported that she had thought about hurting herself in the past.  (Tr. 53).  She testified that "sometimes I wish I weren't here."  (Tr. 54).  She stated that she was involuntarily admitted for detoxification the first time, but it was her choice to go back to detox when she got out of jail in 2009.  (Tr. 56).

Regarding restrictions, claimant reported that she could not walk a block without stopping.  (Tr. 58).  She stated that she could lift and carry about 10 pounds.

**(8) Administrative Hearing Testimony of John M. Yent, Vocational Expert ("VE")**.  Mr. Yent classified claimant's past work as a retail cashier as light and semi-skilled, a retail sales clerk as light and semi-skilled, a dietary worker as medium and unskilled, a laundry folder as medium and unskilled, and a waitress as light.  (Tr. 64-65).  The ALJ posed a hypothetical in which he asked the vocational expert to assume a claimant of the same age, education, and past work experience; who could occasionally lift 20 pounds, frequently lift 10 pounds, stand and walk [inaudible] in an eight-hour day, sit for six hours of an eight-hour day, occasionally perform all posturals, and never climb ladders, ropes, or scaffolds.  (Tr. 65-66).  In response, the VE testified that claimant could perform her past work as retail sales clerk, cashier, and waitress.

When the ALJ changed the hypothetical to assume a claimant of the same background who could lift and carry 10 pounds occasionally and lesser amounts more frequently, stand and walk for two hours out of an eight-hour day, and sit for six hours out of an eight-hour day, Mr. Yent testified that claimant could not perform any of her past work.  (Tr. 66).

8

The ALJ posed a third hypothetical in which he asked the VE to assume an RFC for sedentary work limited to simple one- to two-step tasks not involving contact with the general public, such as cashiering, and only incidental contact with co-workers.  In response, the VE testified that there would be no jobs available.  (Tr. 67).

**(9) The ALJ's Findings**.  Claimant argues that: (1) the ALJ erred in finding that her mental impairments were not severe impairments at Step 2 of the sequential evaluation process, and (2) the ALJ failed to apply the proper legal standards in assessing her residual functional capacity (RFC); specifically, she failed to conduct a function-by-function assessment based on all relevant evidence of her ability to do work-related activities as required by SSR 96-8p.

The ALJ noted that the record revealed "relatively infrequent" trips to the doctors for Claimant's allegedly disabling symptoms.  It is well established that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability.  *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Chester v. Callahan*, 193 F.3d 10, 12 (1st Cir. 1999) (gaps in the medical record regarding treatment can constitute "evidence" for purposes of the disability determination); *McGuire v. Commissioner of Social Security*, 178 F.3d 1295 (6th Cir.1999) (gaps in treatment may reasonably be viewed as inconsistent with a claim of debilitating

symptoms); *Franklin v. Sullivan*, 1993 WL 133774 (E.D. La. 1993); *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling condition).

The ALJ also noted that although her doctors recommended that Claimant go to physical therapy, there is no indication in the medical records that she ever followed up and attended therapy. It is well established that failure to follow prescribed medical treatment precludes an award of benefits. 20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). Further, none of claimant's treating or consulting physicians has indicated that her physical impairments were disabling. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (substantial evidence supported ALJ's finding that claimant could perform a wide range of sedentary work where no physician who examined her pronounced her disabled). Thus, this argument lacks merit.

Further, the ALJ noted inconsistencies in the record regarding claimant's statements as to why she had stopped working. (Tr. 25). She observed that claimant testified that she had stopped working because she had problems getting along with others and following instructions (Tr. 53, 63); however, she noted in the Adult Disability Report that she had stopped on April 3, 2008, due to being incarcerated, and became disabled on October 8, 2008, when she was diagnosed

with HIV.  (Tr. 143).

Moreover, the ALJ observed that on January 4, 2010, the attending registered nurse had noted that claimant had a positive response to medications and was maintaining stability on her current regimen.  (Tr. 21, 287).  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

The record reflects that despite claimant's alleged impairments, she was able to clean her house, make sandwiches and microwave foods daily, wash dishes, do laundry, and shop.  (Tr. 160, 162-63).  She also prepared breakfast and supper for her oldest son, watched television, read, and helped her son with homework.  (Tr. 160, 164).  It is appropriate to consider the claimant's daily activities when deciding the claimant's disability status.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995).

Claimant argues that the ALJ erred in assessing her residual functional capacity, citing SSR 96-8p which states that a residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Although

the Social Security Administration's rulings are not binding on this court, the Fifth Circuit has frequently relied upon those rulings in evaluating an ALJ's decision. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001).  In fact, the Fifth Circuit has held that, when making a residual functional capacity determination, an ALJ must perform a function-by-function assessment of a claimant's capacity to perform sustained work-related physical and mental activities.  *Id.* at 602-23.

Here, Claimant asserts that the ALJ's review of her functioning was insufficient because it did not include a narrative discussion with citations to the evidence demonstrating that she is capable of standing and walking six hours out of an eight-hour work day, as is necessary for light work, and failed to address the effect that her "residual deformity" will have on her ability to stand or walk for extended periods of time.

A review of the ALJ's decision reveals, however, that she reviewed in detail Claimant's medical records and the state agency consultant's functional analysis as well as Claimant's hearing testimony.  The undersigned finds that this was sufficient.  When an ALJ's residual functional capacity assessment is based at least in part on the function-by-function analysis of claimant's exertional limitations contained in a state examiner's medical report, the legal standard set forth in the jurisprudence and in SSR 96-8p is satisfied.  See *Onishea v. Barnhart*,

12

116 Fed. App'x. 1, 2 (5th Cir. 2004).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED***

*SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).

Signed October 10, 2013, at Lafayette, Louisiana.

_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  10/10/2013
By:  MBD

14